### JERROLD M. METCOFF ET AL. *v.* IRENE LEBOVICS ET AL.

Superior Court, Complex Litigation Docket, Judicial District of Waterbury
File No. X06-CV-05-5000521 S

---

Memorandum filed August 16, 2007

*Berman & Sable, LLC*, for the plaintiffs.

*Ivy, Barnum & O'Mara*, for the defendants.

STEVENS, J.

## STATEMENT OF THE CASE

This action was instituted by the plaintiffs, Jerrold M. Metcoff and David Wilson, against the defendants, Irene Lebovics, Cy E. Hammond, John J. McCloy II, Sam Oolie and Michael J. Parrella. All the defendants are officers or directors of a corporation named NCT Group, Inc. (NCT Group).[1] NCT Group is incorporated under the laws of the state of Delaware. The operative complaint is the revised complaint dated December 20, 2006. This complaint asserts two causes of action against the defendants—one for breach of fiduciary duty and the other for violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Pending before the court is the defendants' motion to strike. As will be explained, the motion to strike is granted.

The claims at issue emanate from a merger agreement executed by NCT Group, NCT Midcore, Inc., now known as Midcore Software, Inc. (NCT Midcore), and

---

[1] According to the complaint, the defendants hold the following positions with NCT Group: Hammond is the senior vice president, chief financial officer, treasurer and a member of the board of directors; Parrella is the chief executive officer and chairman; and McCloy, Lebovics and Oolie are members of the board of directors.

Midcore Software. The plaintiffs were the major stockholders of Midcore Software, and the agreement called for a merger between Midcore Software and NCT Midcore, with NCT Midcore being the surviving corporation. As part of the merger, the plaintiffs were to receive shares of NCT Group stock and certain royalties. Most of the 256 paragraphs of the complaint address how NCT Group and NCT Midcore breached this agreement and, in the process, committed other sundry, wrongful acts. Neither NCT Group nor NCT Midcore is a defendant in this action and, therefore, the allegations about their breach of the agreement are peripheral to the substance of the plaintiffs' complaints against the defendants, except to the extent that they support the plaintiffs' claim that they are creditors of NCT Group.

Count one of the complaint alleges that NCT Group became insolvent and that the defendants, as officers or directors of NCT Group, owed fiduciary duties to the corporation's creditors, such as the plaintiffs. This count further alleges that the defendants committed various acts in violation of these fiduciary duties and contrary to any valid exercise of business judgment. These acts included the defendants' authorizing fraudulent transfers of NCT Group assets, receiving exorbitant compensation, including bonuses and stock options, and engaging in self-dealing (apparently involving NCT Group or its subsidiary dealing with entities controlled by certain of the defendants). The plaintiffs also claim that the defendants breached their fiduciary duties by not causing the delivery to the plaintiffs of the NCT Group shares that the plaintiffs were entitled to receive under the merger agreement. The plaintiffs further allege that the defendants' actions "demonstrated a marked degree of animus, ill will and spite" toward the plaintiffs.

In count two of the complaint, the plaintiffs allege that the defendants' conduct in breach of their fiduciary

duties indicates that they were engaged in an "unfair, deceptive, immoral oppressive and/or unscrupulous practice in the conduct of their primary business, trade or commerce," in violation of CUTPA. According to the complaint, each defendant's primary business, trade or commerce includes "performing the functions of an NCT Group director and/or officer."

In their demand for relief, the plaintiffs seek "money damages," as well as "interest pursuant to [General Statutes] § 37-3a." The plaintiffs also seek punitive damages and attorney's fees under CUTPA, General Statutes § 42-110g.

## DISCUSSION

A motion to strike tests the legal sufficiency of a pleading. Practice Book § 10-39; *Ferryman* v. *Groton*, 212 Conn. 138, 142, 561 A.2d 432 (1989); *Mingachos* v. *CBS, Inc.*, 196 Conn. 91, 108, 491 A.2d 368 (1985). "The purpose of a motion to strike is to contest . . . the legal sufficiency of the allegations of any complaint . . . to state a claim upon which relief can be granted. In ruling on a motion to strike, the court is limited to the facts alleged in the complaint. The court must construe the facts in the complaint most favorably to the plaintiff." (Internal quotation marks omitted.) *Nova-metrix Medical Systems, Inc.* v. *BOC Group, Inc.*, 224 Conn. 210, 214–15, 618 A.2d 25 (1992). The trial court deciding a motion to strike must consider as true the well pleaded facts, but not the legal conclusions, set forth in the complaint. *Liljedahl Bros., Inc.* v. *Grigsby*, 215 Conn. 345, 348, 576 A.2d 149 (1990); *Blancato* v. *Feldspar Corp.*, 203 Conn. 34, 36–37, 522 A.2d 1235 (1987). The court should view the facts in a broad fashion, on one hand, to include facts that are necessarily implied by and fairly provable by the allegations but, on the other hand, to avoid enlarging the allegations of the complaint by assuming facts that are clearly not

alleged. See *Faulkner* v. *United Technologies Corp.*, 240 Conn. 576, 580, 693 A.2d 293 (1997); *Dennison* v. *Klotz*, 12 Conn. App. 570, 577, 532 A.2d 1311 (1987), cert. denied, 206 Conn. 803, 535 A.2d 1317 (1988).

## I

## FIRST COUNT—BREACH OF FIDUCIARY DUTY

## A

## Direct Claim

In the first count of the complaint, the plaintiffs assert claims against the defendants for breaching the fiduciary duties that the defendants, as officers and directors of NCT Group, allegedly owed to the corporation's creditors generally, and to the plaintiffs, as creditors, particularly. The first claim may be characterized as a derivative claim on behalf of the corporation and the second claim may be characterized as a direct claim by the plaintiffs.

As to their direct claim, the plaintiffs allege that because NCT Group was insolvent and the defendants' actions evidenced hostility directly toward them as creditors, the defendants, as officers and directors of NCT Group, owed the plaintiffs fiduciary duties on which they may base personal claims for monetary compensation against the defendants. In support of this position, the plaintiffs primarily rely on *Production Resources Group, L.L.C.* v. *NCT Group, Inc.*, 863 A.2d 772 (Del. Ch. 2004). In support of their motion to strike, the defendants contend that as a matter of law, they do not owe the plaintiffs any such fiduciary duties and, even if they did, the plaintiffs have failed to assert allegations sufficient to bring a direct claim against them under the holding of *Production Resources Group, L.L.C.*[2]

---

[2] After oral argument, the court directed the parties to file supplemental memoranda of law addressing whether Connecticut law or Delaware law controlled the plaintiffs' fiduciary duty claims. The parties agree that Delaware law controls the plaintiffs' derivative claims against the defendants.

As a general rule, officers and directors of a corporation owe fiduciary duties to the corporation and its shareholders, not to any individual creditor. However, the court in *Production Resources Group, L.L.C.* v. *NCT Group, Inc.*, supra, 863 A.2d 772, opined that directors may owe a fiduciary duty to a corporate creditor when the corporation is insolvent, the creditor's claim is liquidated or "imminently" due and the directors' actions against the creditor evince direct animus or hostility. Id., 798.

After the parties' oral argument on the motion to strike, the Delaware Supreme Court issued the decision in *North American Catholic Educational Programming Foundation, Inc.* v. *Gheewalla*, 930 A.2d 92 (Del. 2007), rejecting the holding and reasoning of *Production Resources Group, L.L.C.*, regarding a director's exposure to direct claims of creditors when a corporation is insolvent or in the "zone of insolvency." The court held that "creditors of a Delaware corporation that is either insolvent or in the zone of insolvency have no right, as a matter of law, to assert direct claims for breach of fiduciary duty against its directors." Id., 103.

In a supplemental memorandum of law filed in response to the Delaware court's decision in *North American Catholic Educational Programming Foundation, Inc.*, the plaintiffs emphasize that this issue is one of first impression in Connecticut, and they urge the court to reject that court's holding and adopt the reasoning of courts in other jurisdictions recognizing direct claims by creditors of insolvent corporations

---

As to the plaintiffs' direct claims, the parties disagree, with the plaintiffs maintaining that Connecticut law controls and the defendants maintaining that Delaware law controls. The court finds it unnecessary to resolve this dispute because the court concludes that under either Connecticut or Delaware law, the plaintiffs fail to state a cause of action for a direct claim against the defendants for breach of fiduciary duty.

against the corporations' directors.[3] The court rejects this invitation, finding that the reasoning of *North American Catholic Educational Programming Foundation, Inc.*, is persuasive and dispositive: "It is well established that the directors owe their fiduciary obligations to the corporation and its shareholders. While shareholders rely on directors acting as fiduciaries to protect their interests, creditors are afforded protection through contractual agreements, fraud and fraudulent conveyance law, implied covenants of good faith and fair dealing, bankruptcy law, general commercial law and other sources of creditor rights. Delaware courts have traditionally been reluctant to expand existing fiduciary duties. Accordingly, the general rule is that directors do not owe creditors duties beyond the relevant contractual terms." (Internal quotation marks omitted.) Id., 99.

"Recognizing that directors of an insolvent corporation owe direct fiduciary duties to creditors, would create uncertainty for directors who have a fiduciary duty to exercise their business judgment in the best interest of the insolvent corporation. To recognize a new right for creditors to bring direct fiduciary claims against those directors would create a conflict between those directors' duty to maximize the value of the insolvent corporation for the benefit of all those having an interest in it, and the newly recognized direct fiduciary duty to individual creditors. Directors of insolvent corporations must retain the freedom to engage in vigorous, good faith negotiations with individual creditors for the benefit of the corporation." Id., 103.

Thus, the court holds that as a matter of law, the general rule is that whether a corporation is solvent or

---

[3] See, e.g., *Technic Engineering, Ltd.* v. *Basic Envirotech, Inc.*, 53 F. Sup. 2d 1007, 1010–12 (N.D. Ill. 1999) (applying Illinois law); *Lopez* v. *TDI Services, Inc.*, 631 So. 2d 679, 688 (La. App.), cert. denied, 637 So. 2d 501 (La. 1994).

insolvent, directors of the corporation do not owe a fiduciary duty to a corporate creditor that would expose them to personal liability to the creditor for an alleged breach of such duty. The officers and directors of a corporation owe their fiduciary duties to the corporation and its shareholders, and corporate creditors are afforded rights and remedies under existing and extensive contract, tort and statutory protections.

## B

## Derivative Claim

The parties agree that the plaintiffs' derivative claim is controlled by Delaware law. As was just discussed, the Delaware Supreme Court in *North American Catholic Educational Programming Foundation, Inc.*, held that a creditor of an insolvent corporation cannot assert a direct claim against the corporation's directors. The court also stated that such a creditor may assert a derivative claim against the directors for breach of the directors' fiduciary duties owed to the corporation. Id., 101.[4] Although such an action is brought by a creditor of an insolvent corporation, the essential nature of this

---

[4] In concluding that directors of an insolvent corporation have a fiduciary duty to the corporation's creditors, the court in *North American Catholic Educational Programming Foundation, Inc.*, cites *Production Resources Group, L.L.C.* v. *NCT Group, Inc.*, supra, 863 A.2d 791, which explains this issue as follows: "In insolvency, creditors, as residual claimants to a definitionally-inadequate pool of assets, become exposed to substantial risk as the entity goes forward; poor decisions by management may erode the value of the remaining assets, leaving the corporation with even less capital to satisfy its debts in an ultimate dissolution. The elimination of the stockholders' interest in the firm and the increased risk to creditors is said to justify imposing fiduciary obligations towards the company's creditors on the directors. A strand of authority (by no means universally praised) therefore describes an insolvent corporation as becoming akin to a trust for the benefit of the creditors. This line of thinking has been termed the 'trust fund doctrine.' Under a trust fund approach, the directors become trustees tasked with preserving capital for the benefit of creditors who are deemed to have an equity-like interest in the firm's assets."

claim is derivative and is therefore the same as a share-holder derivative action—the action is to remedy harm to the corporation, and any recovery must go to the corporation. Any benefit to the complaining creditor is, therefore, derivative or indirect in the sense that the recovery increases the assets or the economic viability of the insolvent corporation as a whole. *Production Resources Group, L.L.C.* v. *NCT Group, Inc.*, supra, 863 A.2d 792.

A "cardinal precept" of Delaware corporate law is that a corporation's directors manage the business and affairs of the corporation, and "[b]y its very nature the derivative action impinges on the managerial freedom of directors." *Aronson* v. *Lewis*, 473 A.2d 805, 811 (Del. 1984), overruled in part on other grounds by *Brehm* v. *Eisner*, 746 A.2d 244, 251 (Del. 2000). Although deriva-tive actions recognize a need for a mechanism to hold directors and officers accountable to the corporation for their own wrongdoing, such actions still may not be pursued if the corporation is willing and able to pursue the suit itself. Consequently, under Delaware law, before the institution of a derivative action, the complainant must give the directors the opportunity to manage the litigation and satisfy various prerequisites to mitigate "the potentially disruptive effects of deriva-tive litigation on the ability of a board of directors to direct the business and affairs of a corporation." *Agostino* v. *Hicks*, 845 A.2d 1110, 1117 (Del. Ch. 2004).[5]

[5] Section 327 of title 8 of the Delaware Code Annotated provides: "In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law." Del. Code Ann. tit. 8, § 327 (2001).

Rule 23.1 (a) of the Delaware Chancery Court rules provides in relevant part: "In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may prop-erly be asserted by it, the complaint shall allege that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share of membership thereafter devolved

Determining whether an action is direct or derivative is important because derivative claims, but not direct claims, are subject to these procedural prerequisites and impinge on the managerial role of the corporation's directors.

The defendants concede that the plaintiffs complain about matters indicating corporate injury. The defendants argue, however, that the plaintiffs have not truly asserted derivative claims because they seek relief to benefit themselves and not NCT Group, namely, damages for the defendants' failure to "cause delivery" of the shares of NCT Group due and owing to the plaintiffs under the merger agreement. In response, the plaintiffs contend that they properly have asserted derivative claims, and they have either met all the requirements for asserting such claims or are not required to meet these requirements. The court agrees with the defendants to the extent that the derivative claims are not pleaded with sufficient particularity to survive a motion to strike.

"The distinction between direct and derivative claims is frustratingly difficult to describe with precision." *Agostino* v. *Hicks*, supra, 845 A.2d 1117. As a consequence, the distinction between direct and derivative claims is often difficult to discern.[6] This task is made

on the plaintiff by operation of law. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."

An additional, judicially imposed requirement is that a plaintiff in a derivative action must be an adequate representative. *Youngman* v. *Tahmoush*, 457 A.2d 376, 379 (Del. Ch. 1983).

[6] Even under Connecticut law, Judge Adams recently observed, "Reading Connecticut Supreme Court cases on the distinctions between direct and derivative actions can be an unsettling experience as the decisions are few in number, somewhat sporadic in issuance, and deal with different fact scenarios." *Puri* v. *Norwalk Anesthesiologists, P.C.*, Superior Court, judicial district of Stamford-Norwalk, Complex Litigation Docket, Docket No. X08-CV-05-4003801 S (July 19, 2006) (*Adams, J.*).

more arduous in this case because rather than separating their direct and derivative claims into separate counts, plaintiffs combine both these causes of action into a hodgepodge of allegations contained in a single count. See Practice Book § 10-26 (requiring plaintiff to assert different causes of action in separate counts of complaint).

Under Delaware law, the test for determining whether a claim is direct or derivative is stated simply as follows: "Who suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy?" *Tooley* v. *Donaldson, Lufkin & Jenrette,* 845 A.2d 1031, 1035 (Del. 2004), after remand, 2005 Del. Ch. LEXIS 67 (Del. Ch. May 13, 2005). The parties agree that the complaint's allegations involve claims of self-dealing and bad faith that directly affect NCT Group. What is less clear from the complaint's allegations is how the corporation has been harmed and what precise relief the plaintiffs are seeking to rectify any such harm.

To determine "who would receive the benefit of the recovery or other remedy" as required under the test articulated by *Tooley* v. *Donaldson, Lufkin & Jenrette,* supra, 845 A.2d 1035, the complaint must clearly indicate what relief is being sought. Viewing the complaint broadly in favor of the plaintiffs, one could guess or possibly assume what relief the plaintiffs are seeking derivatively, but in the face of the plaintiffs' somewhat convoluted allegations and the Practice Book's fact pleading requirements (Practice Book § 10-1), this is not a matter that the court (or the defendants) should have to guess or make assumptions about. In many instances in which the relief sought is unclear from the language of the complaint, it may be reasonably discerned from the claims being asserted or the gravamen of the complaint. However, the allegations of the plaintiffs' complaint, described nicely, are all over the

place, possibly because the plaintiffs have combined their direct and derivative causes of action into one count.

For example, most of the complaint addresses the plaintiffs' claims against NCT Group and NCT Midcore, and describes the various causes of action the plaintiffs have against these corporations, including breach of contract, breach of warranties, negligent and intentional misrepresentation, fraudulent transfers, civil conspiracy and CUTPA claims. As indicated previously, except for supporting the plaintiffs' point that they are creditors of NCT Group, these allegations are not particularly material to the plaintiffs' derivative claim.

The complaint contains two allegations that support the claim that the defendants have engaged in "self-dealing." The first is that the defendants have "preferred themselves in the form of large salaries, reimbursements and payment of other contingencies and benefits" when the corporation was insolvent. The complaint does not indicate whether the plaintiffs seek to repudiate these arrangements and have the payments disgorged or whether the plaintiffs are seeking some other form of damages (for example, a determination of reasonable compensation and a recovery of what was received in excess of this amount).

Second, the complaint alleges that the defendants authorized NCT Group to enter into business arrangements with other companies that are controlled by one or more of the defendants or by a de facto shareholder. The complaint does not allege that these associations were unfair to NCT Group and, more particularly, the complaint neither alleges that any harm or losses were sustained by NCT Group as a result of these associations, nor explains the extent or nature of such harm. As a general rule, corporate transactions in which a director has a financial interest are not per se void or

voidable. See Del. Code Ann. tit. 8, § 144 (2001); *Valeant Pharmaceutical International* v. *Jerney*, 921 A.2d 732, 745 (Del. Ch.) (indicating Del. Code Ann. tit. 8, § 144, provides safe harbors to prevent nullification of transactions solely because of director self-interest), appeal dismissed, 929 A.2d 784 (Del. 2007).

The complaint also alleges that contrary to the exercise of valid business judgment, the defendants authorized transfers of stock and promissory notes to insiders for no or inadequate consideration in violation of General Statutes §§ 52-552e or 52-552f. The complaint does not appear to seek any relief under the fraudulent conveyance statute, General Statutes § 52-552h; at least, the plaintiffs do not make any express demand for any such relief, and the court does not address the applicability of that statute to the allegations of this complaint. The appropriate corporate relief to address the alleged transactions might involve either the recovery of the transferred property (which would require naming the transferees as additional defendants) or a recovery of an amount representing the difference between what was paid and what should have been paid as the fair cost for the transferred assets. The latter is what the plaintiffs may be seeking by their general "damages" demand, but the court agrees with the defendants that there is nothing expressly asserted in the body of the complaint indicating that the plaintiffs have any interest in such a recovery.

The defendants appear to make a cogent argument that the plaintiffs only assert a very general, vague claim for derivative damages because the only relief they quite clearly express and actually seek is damages for their direct claims. Regardless of whether the complaint's vagueness may be explained for this reason, the court concludes that to assert a derivative claim in a manner sufficient to distinguish this cause of action from a direct claim, the complaint must clearly describe the

relief being sought for the benefit of the corporation in a particularized manner so that this determination is not controlled by surmise, assumption or conjecture.[7]

The defendants' next argument is that the plaintiffs cannot assert derivative claims because, in that these claims emanate from the plaintiffs' failure to acquire NCT Group shares under the merger agreement, the plaintiffs are not "true" creditors and should be treated as shareholders. The defendants reason that "to permit [the] plaintiffs to assert entitlement to an enhanced position by an equitable construct designed to favor true creditors over shareholders would place [the] plaintiffs in a far better position than that in which they would have been but for the alleged breach of the alleged contractual obligation to receive stock." As to the plaintiffs' derivative claim, the defendants' argument is rejected as emphasizing a difference without legal significance.

Even as to an insolvent corporation, directors still owe fiduciary duties to shareholders. Insolvency "simply changes the class of those eligible to press the claim derivatively, by *expanding* it to include creditors." (Emphasis added.) *Production Resources Group, L.L.C.* v. *NCT Group, Inc.,* supra, 863 A.2d 793. Appreciating the general proposition that stockholders and creditors of an insolvent corporation may have vastly different interests and preferences, the court has not located any authority precluding a plaintiff who may be a stockholder, a creditor or both from filing a derivative action on behalf of the corporation, especially when

---

[7] Although this pleading deficiency may be fatal to this complaint, it is not necessarily fatal to the case, as the plaintiffs have the right to plead over. Practice Book § 10-44. Also, as will be discussed, greater specification of the derivative relief being sought will assist the court's consideration of whether the plaintiffs are adequate representatives to maintain derivative claims.

the claim is based on self-dealing or bad faith conduct by the directors. See generally id., 790 n.57, 791–93.

The defendants' last argument regarding the plaintiffs' derivative claims is that the plaintiffs have failed to satisfy the procedural prerequisites necessary for the filing of a derivative action under Delaware law. See footnote 5. Specifically, the defendants claim that the plaintiffs were not shareholders during the entire time period during which the transactions at issue took place; that the plaintiffs did not make a pre-suit demand on the NCT Group directors to take action on the matters of the complaint; and the plaintiffs are not adequate representatives to assert the derivative claims. In response, the plaintiffs contend that these pre-suit requirements apply to derivative actions filed by shareholders and not to those filed by creditors such as the plaintiffs. In addition, the plaintiffs maintain that pre-suit demand is excused because they allege personal interest and self-dealing on the part of the defendants.

There are relatively few cases discussing derivative actions instituted by creditors, and there are no Delaware cases delineating the pre-suit requirements for such actions. The Chancery Court's decision in *Production Resources Group, L.L.C.* v. *NCT Group, Inc.*, supra, 863 A.2d 772, discusses the pre-suit requirements for such cases, but does not reach a conclusion on the precise issues presented here because these issues were either not raised or fully addressed by the parties in *Production Resources Group, L.L.C.* Id., 795–96.

The plaintiffs are correct that the textual requirements of Del. Code Ann. tit. 8, § 327 (2001), and rule § 23.1 of the Delaware Chancery Court rules apply to shareholder derivative actions. Contrary to the plaintiffs' position, however, it would be very anomalous for the parameters for the filing of derivative actions to be

broader for a creditor when a corporation is insolvent than for a shareholder when the corporation is solvent.[8]

The court agrees with the plaintiffs that because they are asserting derivative claims as creditors, they need not satisfy the rule requiring them to be shareholders when the contested transactions took place.[9] On the other hand, the court agrees with the defendants that the representation and demand requirements are applicable here because they are integral aspects of derivative claims. A well established, judicially imposed rule is that "the plaintiff in a derivative action must be qualified to serve in a fiduciary capacity as a representative of a class, whose interest is dependent upon the representative's adequate and fair prosecution." *Youngman* v. *Tahmoush*, 457 A.2d 376, 379 (Del. Ch. 1983). Similarly, the presuit demand requirement facilitates the balance between the protection of corporate interests through derivative actions and the deference given to corporate directors' managerial discretion:

[8] On the somewhat related issue of whether a provision of an insolvent corporation's certificate of incorporation shields directors from creditor liability for certain breaches of fiduciary duties, the court in *Production Resources Group, L.L.C.* v. *NCT Group, Inc.*, supra, 863 A.2d 794, states: "It would be puzzling if, in insolvency, the equitable law of corporations expands the rights of firms to recover against their directors so to better protect creditors, who, unlike shareholders, typically have the opportunity to bargain and contract for additional protections to secure their positions. The kind of claims that an insolvent firm could press against its directors would, one would think, be at most coextensive with, and certainly not superior to, the claims that a solvent firm itself could bring against its directors. Such claims should not be expanded to enable the firm to hold directors liable for lack of due care simply because the firm is or even worse, has become insolvent."

[9] This conclusion that the plaintiffs are not required to be shareholders when the alleged transactions occurred does not mean that they are not required to have been creditors when the incidents occurred because it follows that a director would owe no fiduciary duty to a person who was neither a creditor nor a shareholder of the corporation. Because the defendants do not assert this argument as part of their motion to strike, the court does not reach it.

"The demand requirement serves a salutary purpose. First, by requiring exhaustion of intracorporate remedies, the demand requirement invokes a species of alternative dispute resolution procedure which might avoid litigation altogether. Second, if litigation is beneficial, the corporation can control the proceedings. Third, if demand is excused or wrongfully refused, the stockholder will normally control the proceedings." (Internal quotation marks omitted.) *Brehm* v. *Eisner*, supra, 746 A.2d 255.

The plaintiffs make a strong argument that the complaint's allegations of self-interest and self-dealing by the defendants as directors of NCT Group operate to excuse them from the demand requirement. See generally *Aronson* v. *Lewis*, supra, 473 A.2d 805. The defendants do not squarely address whether these allegations of the complaint are sufficient to excuse the demand requirement. The plaintiffs, on the other hand, do not address whether they are adequate representatives to maintain this derivative action. The plaintiffs' reliance on *Production Resources Group, L.L.C.* v. *NCT Group, Inc.*, supra, 863 A.2d 772, to argue that the representative requirement is inapplicable to creditor derivative actions is misplaced because, as previously stated, *Production Resources Group, L.L.C.*, does not reach this question. Id., 795–96. In any event, the court rejects the plaintiffs' position and concludes that the plaintiffs, as creditors of an insolvent corporation, should be adequate class representatives for a derivative action. The case law indicates that the defendants have the burden of proof on this issue. See *Youngman* v. *Tahmoush*, supra, 457 A.2d 381–82 (defendants must show that plaintiff should be found disqualified as inadequate representative).

Despite the numerous and extensive memoranda of law filed by the parties, the court is not satisfied that they have fully and squarely addressed whether the

plaintiffs are excused from the pre-suit demand requirement and whether the plaintiffs are adequate representatives to maintain a derivative action. Especially because the court has already ruled that the plaintiffs must revise the complaint to describe more clearly what derivative relief they are seeking, the court will not now resolve these issues regarding the demand and representation requirements. The defendants have leave to reassert these objections in response to any substitute complaint filed by the plaintiffs asserting derivative claims.

## II

### SECOND COUNT—VIOLATION OF CUTPA

The defendants next move to strike the plaintiffs' second count, which alleges violation of CUTPA. CUTPA provides a private cause of action to "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b . . . ." General Statutes § 42-110g (a). General Statutes § 42-110b (a) provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Trade or commerce is defined as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." General Statutes § 42-110a (4). CUTPA is remedial in nature and is to be liberally construed consistent with its legislative design. *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 492, 656 A.2d 1009 (1995).

As to Hammond, McCloy, Oolie and Parrella, the complaint alleges that each of these defendants' "primary business, trade or commerce, at all relevant times,

includes performing the functions of an NCT Group director and/or officer, for which he was more than generously compensated . . . ."[10] The defendants contend that contrary to the legal conclusions asserted in the complaint, the complaint fails to allege any facts to support the plaintiffs' claim that the defendants' conduct involved "trade or commerce," as defined by CUTPA. The court agrees.

In response to the defendants' position, the plaintiffs first argue that their derivative claims support their complaints under CUTPA. The plaintiffs reason that these claims, which involve director self-dealing and waste of corporate assets, so concern NCT Group's creditors that they implicate trade or commerce covered by CUTPA. The court rejects this reasoning. The plaintiffs have no standing to assert direct causes of action to benefit themselves for claims or injuries owned or sustained by the corporation. See *Smith* v. *Snyder*, 267 Conn. 456, 461, 839 A.2d 589 (2004); *Kramer* v. *Western Pacific Industries, Inc.*, 546 A.2d 348, 351 (Del. 1988). CUTPA does not give the plaintiffs such standing merely by the plaintiffs' claiming that the defendants engaged in unfair or deceptive conduct that in some way involved trade or commerce because "purely intracorporate conflicts do not constitute CUTPA violations . . . ." *Ostrowski* v. *Avery*, 243 Conn. 355, 379, 703 A.2d 117 (1997).

The plaintiffs next argue that their direct claims are sufficient to establish a cause of action under CUTPA because the defendants made decisions implicating trade or commerce as part of their functions as NCT Group officers or directors. The plaintiffs refer to the defendants' "refusal to cause" NCT Group to fulfill its

[10] The complaint does not expressly describe defendant Lebovics' primary trade or business, only stating that this defendant was a member of NCT Group's board of directors.

obligations under the merger agreement for personal and wrongful reasons. The plaintiffs also rely on NCT Group's fraudulent transfer of its assets to a de facto majority shareholder. According to the plaintiffs, these allegations indicate that the defendants' conduct impacted trade or commerce because these claims "concern NCT Group's relationship with its creditors and, in particular, NCT Group's ability to pay plaintiffs." Again, the court finds the plaintiffs' arguments unpersuasive.

The plaintiffs' contentions make no distinction between the corporate acts of NCT Group and the decisions of its directors that caused these acts—the plaintiffs treat these actions interchangeably. Consequently, the plaintiffs fail to appreciate the legal significance of the corporate entity and the corporate shield that is associated with its existence and operation. See generally *Falcone* v. *Night Watchman, Inc.*, 11 Conn. App. 218, 222, 526 A.2d 550 (1987) ("[T]he corporate shield should not be lightly disregarded . . . . To do so would be to act in opposition to the public policy of this state as expressed in legislation concerning the formulation and regulation of corporations." [Internal quotation marks omitted.]). Stated differently, on the basis of the plaintiffs' argument, the scope of CUTPA obliterates the corporate shield so that any act of the corporation may be attributed to its directors or officers so that the latter may be held liable under CUTPA. The scope of CUTPA is broad, but not that broad. Certainly, there are circumstances in which the individual acts of a corporate officer or employee may form the basis of a CUTPA violation[11] but the actions of an officer, director or employee taken on behalf of the corporation and

---

[11] See, e.g., *Larsen Chelsey Realty Co.* v. *Larsen*, supra, 232 Conn. 490–99, in which CUTPA liability was found in favor of a company against its president when the president engaged in unfair and deceptive conduct while preparing to leave the company and work for a competitor.

within the context of his corporate responsibilities are ordinarily outside of CUTPA's application. This point follows from the fact that an officer, director or employee of a corporation primarily provides services to the corporation and therefore is not engaged "in the conduct of any trade or commerce" within the meaning of CUTPA. Thus, it follows in turn that CUTPA does not apply to intracorporate affairs; *Ostrowski* v. *Avery*, supra, 243 Conn. 379; or employer-employee relations. *Quimby* v. *Kimberly Clark Corp.*, 28 Conn. App. 660, 670–71, 613 A.2d 838 (1992). The corporation itself may be engaging in a trade or business in commerce, but not the individual who is merely working for or on behalf of the corporation. In other words, CUTPA is typically directed to businesses and self-employed people, but not to everyone who may be employed or engaged by such individuals.

Nevertheless, although the status or relationships of a defendant are relevant in determining whether his actions implicate trade or commerce, these factors are not controlling—the controlling consideration is the defendant's conduct. *Fink* v. *Golenbock*, 238 Conn. 183, 214, 680 A.2d 1243 (1996). It is on this basis that the court concludes that as to the defendants' alleged personal liability, their conduct involved corporate acts outside CUTPA's definition of trade or commerce, rather than acts committed directly by them that might fall within CUTPA's coverage. This distinction may be slight or slim, but this difference is one with legal significance, for as the plaintiffs precisely allege in their complaint, the defendants "caused" or failed "to cause" action by the corporation, and this corporate conduct is the gravamen of their complaints. According to the complaint, these defendants did not personally engage in any trade, business or commercial activity directly involving the plaintiffs. The defendants had no contractual relationship with the plaintiffs to satisfy or violate.

The merger agreement imposed obligations on NCT Group. Furthermore, the complaint alleges that NCT Group transferred its assets for no or inadequate consideration. There are circumstances under which the corporate shield should be pierced or deemed not to exist. *Falcone* v. *Night Watchman, Inc.*, supra, 11 Conn. App. 218. The criteria for piercing the corporate veil have not been alleged or established in this case. Indeed, the plaintiffs do not even argue otherwise.

The case relied on by the plaintiffs, *Fink* v. *Golenbock*, supra, 238 Conn. 183, is distinguishable. In *Fink*, the plaintiff and the defendant Golenbock were medical practitioners, each owning 50 percent of their professional corporation. The plaintiff brought a derivative shareholder action on behalf of the corporation against Golenbock for taking unfair and deceptive actions "to ensure that the plaintiff and the corporation would have no opportunity to engage in the practice of medicine . . . ." Id., 214. The court rejected the defendant's argument that CUTPA did not apply because the case only involved a dispute over the internal governance of the corporation. The court noted that the defendant took over the corporation's assets, employees and patients, using them to start a new business in direct competition with the corporation. Id. The court concluded that the case involved the provision of medical services within CUTPA's definition of trade or commerce and that the defendant's conduct "amounted to competitive moves designed to co-opt all of the corporation's operations" in the medical services market. Id.

As compared to the defendant in *Fink*, the defendants in the present case have not directly or personally engaged in any business or commercial activity in competition with the plaintiffs. According to the complaint, the conduct of each defendant was done only as part of his or her "functions [as] a NCT Group director or

officer." On the basis of the complaint's factual allegations, any impact on trade or commerce flowing from the defendants' decisions made solely as part of their duties as NCT Group officers or directors were essentially incidental to these corporate functions. Cf. *McCann Real Equities Series XXII, LLC* v. *David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 523, 890 A.2d 140 (CUTPA applies to defendant's primary business activity, not to conduct incidental to primary business), cert. denied, 277 Conn. 928, 895 A.2d 798 (2006).

In short, as a general rule, an individual who is merely functioning as an employee, officer or director of a corporation is not involved in conduct that constitutes a trade or commerce within the contemplation of CUTPA. Any other construction would mean that any employee or officer of a corporation would, for example, by simply going to work, be individually subjected to the provisions of CUTPA. Although the plaintiffs correctly emphasize the general proposition that CUTPA is a remedial statute that must be liberally construed, this rule of construction should not be applied so broadly so as to shatter common sense. See generally *Jackson* v. *R. G. Whipple, Inc.*, 225 Conn. 705, 725–26, 627 A.2d 374 (1993) ("it strains credulity to conclude that CUTPA is so formless as to provide redress to any person, for any ascertainable harm, caused by any person in the conduct of any 'trade' or 'commerce' ").

## CONCLUSION

Therefore, for the foregoing reasons, the defendants' motion to strike the revised complaint is granted.